

FILED

JUN 15 2010

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| ANITA BURRIS, | \* | CIV. 08-4206 |
| Plaintiff, | \* | |
| -vs- | \* | REPORT and RECOMMENDATION |
| MICHAEL J. ASTRUE, Commissioner,<br>Social Security Administration, | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff seeks judicial review of the Commissioner's final decision denying her a period

of disability commencing on September 7, 2005, and payment of disability insurance benefits and

supplemental security income under Title II and Title XVI of the Social Security Act.[1]  The

Plaintiff has filed a Complaint and has requested the Court reverse the Commissioner's final

decision denying the Plaintiff disability benefits and remand the matter to the Social Security

Administration for further proceedings.  The matter is fully briefed and has been referred to the

Magistrate Judge for a Report and Recommendation.  For the reasons more fully explained

below, it is respectfully recommended to the District Court that the Commissioner's Decision be

AFFIRMED.

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are
sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether
the claimant is disabled.  The definition of disability is the same under both Titles.  The
difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent
upon her "coverage" status (calculated according to her earning history), and the amount of
benefits are likewise calculated according to a formula using the claimant's earning history.
There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI
benefits is uniform and set by statute, dependent upon the claimant's financial situation, and
reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed her application for both types of benefits.  She filed for
Title II benefits on May 18, 2006 and protectively filed for Title XVI benefits on September 6,
2006.  AR 80-82, 248-49.   Her coverage status for SSD benefits expired on September 30,
2007.  AR 17, 58.  In other words, in order to be entitled to  Title II benefits, Plaintiff must prove
she was disabled on or before that date.  AR 17.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed her application for benefits on May 18, 2006. AR 80-82. In a computerized form entitled "Disability Report-Adult" Plaintiff listed the illnesses, injuries and conditions that limit her abilities to work as "liver cancer/deteriorated hip/asthma/emphysema." AR 124. When asked to describe how her illnesses, injuries or conditions limit her ability to work, Plaintiff stated, "I can't go outside often because it impairs by ability to breathe, chronic pain in my hip impairs my ability to walk, nausea vomiting everyday because of liver cancer, chronic fatigue from liver cancer." AR 125. Plaintiff further explained that she stopped working on September 7, 2005 when she was involved in a trucking accident and injured her hip. AR 125. In a form entitled "Function Report–Adult" she filed in connection with her application (AR 99-106) Plaintiff listed the following effects of her illnesses, injuries or conditions: "my hip hurts me to (sic) badly and its (sic) hard for me to breath (sic) do (sic) to my asthma." Plaintiff filed a form entitled "Disability Report–Appeal" (AR 90-96) in which she explained that her illness, injuries or conditions had worsened since she last filled out a disability report in the following ways: "having increased pain in back and hips. Also have blood around my esophagus and fluid around my liver." She also claimed new physical limitations as a result of her conditions since her last disability report: "Constant pain. I lie on the couch almost all day every day." Plaintiff also claimed the following new illnesses, injuries or conditions since her last disability report: "Saw a specialist for my hip pain and they told me I have a severe back problems stemming from the truck wreck." AR 91. Plaintiff also explained that her daughter did all the housework because Plaintiff was unable to do it, and that Plaintiff's daughter had to help Plaintiff bathe and dress. AR 94. "The pain is so severe that I can barely walk now. I take pain medication but I still have severe pain. I use a cane to get around." *Id.*

Plaintiff's claim was denied initially on August 14, 2006 (AR 55), and on reconsideration

2

on October 20, 2006. AR 47. She requested a hearing (AR 46) and one was held on January 10, 2008, in Huron, South Dakota, before Administrative Law Judge (ALJ) the Honorable Robert Maxwell. AR 288-343. On February 20, 2008, the ALJ issued a twelve page, single-spaced decision affirming the previous denials. AR 17-28.

On March 21, 2008, Plaintiff's attorney sent a letter to the Appeals Council requesting review of the ALJ's decision. AR 6-8. The Appeals Council denied review of Plaintiff's claim on October 17, 2008. AR 2- 4. Plaintiff then timely filed her Complaint in the District Court on December 19, 2008.[2]

## FACTUAL BACKGROUND

### A.    Biographical Information

Plaintiff was born in 1963. She was forty-two on her alleged date of onset and forty-four on the date of the administrative hearing. AR 80, 295. She completed the eighth grade and she has never received her GED nor has she completed any special job training or technical education AR 129. She estimated she could "read a like maybe a first grade book. But you get all these big long words and stuff, I don't know what that means." AR 322. She has never been tested for a learning disability. *Id.* She is widowed and lives in Huron, South Dakota with her teenaged daughter. AR 295, 308, 320.

### B.    Work Experience

Plaintiff's only relevant work experience is as an over-the-road truck driver and as a nurse's aide. AR 85.    That work required her to drive a tractor-trailer and to provide patient care, respectively. *Id.* Both jobs are defined by the DOT regulations as semi-skilled, medium duty jobs. *Id.* She quit working full-time in September, 2005. In September 2005, Plaintiff was involved in a trucking accident and injured her left back, hip and shoulder. AR 218.[3]

---

[2]For reasons which are not clear on the record, it appears the Complaint was not served upon the Commissioner until May, 2009.

[3]Plaintiff described the truck accident to one of her physicians as follows: "big truck hit me in driver door running about 70 miles and (sic) hour." AR 218.

3

## C.    Medical Evidence

### 1.    Avera Weskota Memorial Medical Center (2/24/06 through 3/01/06)

Dr. Lim (Plaintiff's treating physician) referred Plaintiff to Avera Weskota for labs and X-rays in February, 2006. Specifically, Dr. Lim ordered an AP view of the left hip in an attempt to determine the source of Plaintiff's left hip pain. AR 149. Dr. David Peterson interpreted the X-ray. AR 148. He noted no joint space narrowing or bony spurring to suggest degenerative change and no focal bony lesions. *Id.* The visualized soft tissue shadows were unremarkable. *Id.*

### 2.    Mitchell Bone & Joint Surgery–Dr. Ungacta-(10/11/05 through 3/28/06)

Plaintiff first presented to Dr. Felix Ungacta on October 11, 2005 on a referral from Dr. Lim. She indicated she had been in a "very high energy type" truck accident in California approximately one month earlier. AR 154. The other semi was driving 70 miles per hour when it ran a stop sign and hit the driver's side of Plaintiff's truck. Plaintiff crawled out the passenger side of her vehicle before it caught fire. She was air-lifted to a local hospital where she stayed for four days. *Id.* She reported neck, low back, left thigh, left knee and lower extremity pain. Her physical exam, however, was relatively normal. *Id.* X-rays of the low back and cervical spine showed no evidence of fracture. *Id.* Dr. Ungacta diagnosed significant neck and low back strain. He prescribed physical therapy, Ultram,[4] Flexeril and indicated Plaintiff should not work for five weeks. *Id.*

Plaintiff returned to Dr. Ungacta in December, 2005. AR 153. She reported tenderness over the right costrovertebral area but her strength was normal. Dr. Ungacta continued her physical therapy order for low back and abdominal strengthening. He recommended she only attempt short drives in her truck. *Id.*

In January, 2006, Plaintiff reported that an attempt to return to truck driving was

---

[4]Ultram is a centrally acting analgesic. It is indicated for the management of moderate to moderately severe pain in adults. www.rxlist.com. Flexeril is a muscle relaxant indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions. *Id.*

4

unsuccessful. AR 152. On that date, her physical exam revealed intact upper extremity sensation and good grip strength, as well as no tenderness in the lumbar, thoracic or cervical spine. *Id.* Nevertheless, Dr. Ungacta prohibited Plaintiff from driving truck and referred her to Dr. Bruce Elkins for further evaluation. *Id.*

Dr. Ungacta evaluated Plaintiff for continuing left hip pain in March, 2006. AR 151. He reported she continued to have the left hip pain since her MVA in September, 2005. Physical exam revealed a limited range of motion in the left hip with associated groin pain. *Id.* Dr. Ungacta noted past X-rays reveal "moderate amount of hip osteoarthritis." AR 151. A bone scan, however, was negative for femoral neck fracture. *Id.* Dr. Ungacta recommended a left hip cortisone injection. He offered to schedule the injection through the radiology department. *Id.*

### 3. Huron Regional Medical Center Emergency Room (9/14/05 through 3/25/07)

Plaintiff presented at the Huron Regional Medical Center emergency room on September 14, 2005 complaining of left flank pain. AR 167. She explained she had been in a motor vehicle accident in California on September 7 and had been hospitalized there until September 11. She rode a bus home. *Id.* She had been self-medicating with alcohol because her prescribed pain medications were not helping. She complained of low back pain. Her range of motion was decreased and she was diffusely tender on the left side. AR 167. The treating physician diagnosed myalgia secondary to a motor vehicle accident and prescribed Ultram. On September 16, 2005, Plaintiff had a CT scan of the abdomen because of nausea and vomiting. AR 170. The scan revealed a normal liver, spleen, pancreas, aorta, small bowel, colon and kidneys. No free fluid was noted. *Id* .

On October 23, 2005, Plaintiff was delivered to the Huron Medical Center Emergency Room by a friend. AR 166. Plaintiff reportedly swallowed approximately thirty Flexeril, or a combination of Flexeril and Ultram, one half hour previously. The intake nurse noted, "Patient crying and upset states that she wants to end it." *Id.* The treating physician indicated Plaintiff was well known to him and that she had a truck accident four months ago and now had back, shoulder and neck pain for which she was treating with Dr. Ungacta in Mitchell. The physician noted Plaintiff only admitted ingesting four or six pills and that she smelled of alcohol. AR 166. He diagnosed depression and

a suicide attempt. Plaintiff was admitted and held for twenty-four hours until she was deemed not a threat to herself or others. AR 165.

Plaintiff was admitted to the emergency room again on January 14, 2006 complaining of chest pains. AR 162. Plaintiff underwent chest X-rays, EKG and a blood panel. AR 169, 174-77. The X-ray revealed normal heart and lung markings without infiltrate or effusion and no change since the last exam. AR 169. The interpreting radiologist noted "negative chest x-ray." *Id.* Her labs and EKG were also normal. AR 161.

On April 27, 2006, Plaintiff presented at the Huron Regional Medical Center emergency room complaining of bilateral flank pain. AR 158. She had a CT scan of her abdomen because of abdominal pain and suspected kidney stones. AR 168. The scan revealed no kidney stones and no hydronephrosis (obstruction of the urinary tract). The scan did reveal a 1-2 mm calcification near the UVJ (ureterovesical junction). The uterus, ovaries and gallbladder were normal.

Plaintiff again presented at the Huron Regional Medical Center emergency room on July 20, 2006. AR 206. She complained of vomiting, diarrhea, abdominal cramps, headache, and left hip pain. A CT scan of her abdomen was negative. AR 210. Her labs were also relatively normal with the exception of a UTI. AR 207, 211-214.

Plaintiff was admitted to the Huron Regional Medical Center emergency room on October 7, 2006 complaining of fever and dizziness. AR 250. She was treated with Tylenol for fever and headache and IV fluids. AR 251.

Plaintiff presented at the Huron Regional Medical Center emergency room on March 13, 2007 complaining of abdominal pain. AR 248. X-rays revealed slight perihilar infiltrates with mild diffuse interstitial prominence probably representing a viral syndrome. AR 253. Abdominal films revealed moderate stool throughout the colon indicating mild constipation. AR 254.

Plaintiff arrived at the Huron Regional Medical Center emergency room on March 20, 2007

6

complaining of a headache accompanied by nausea and vomiting. AR 246. She reported she had begun the stop-smoking drug Chantix three days earlier.

Plaintiff was admitted to the Huron Regional Medical Center emergency room on March 25, 2007, complaining of right elbow pain. AR 244. She identified no recent injury but indicated the pain had gotten progressively more painful.

### 4.     Dr. Lim[5]- (10/05/05 through 12/29/07)

Plaintiff presented to Dr. Lim's office for the first time on October 5, 2005. She saw a physician's assistant. She indicated she had been involved in a motor vehicle accident on September 7. She was driving her semi when she was hit by another semi who ran a red light. Her truck burst into flames and she was airlifted to the hospital. AR 188. She was heavily sedated for three days. She has had neck, low back and leg pain since that time. *Id.* She has been unable to sleep and has been taking a lot of over the counter pain relievers. She is nauseous. The PA observed that Plaintiff walked with apprehension and did not tolerate sitting very well. AR 188. She had a full range of motion of the neck but did exhibit pain with range of motion. She had full strength in the upper extremities but the PA observed "a lot of spasm of her recto spinae muscles in her back." Straight leg raising tests were normal on the right but the left leg could only be raised to the horizontal position and that caused "quite a bit of discomfort." AR 188. The PA prescribed Prevacid[6] and Naproxen as well as Vicodin and Flexeril. He referred her to an orthopedist, Dr. Ungacta. Plaintiff called the PA the following day, complaining of itching and upset stomach from the Vicodin (hydrocodone). AR 188. The PA substituted Ultram.

---

[5]Included in this section are Plaintiff's visits to the various locations of the Horizon Health Care clinic (Jerauld County Clinic in Wessington Springs, Whiting Memorial Clinic in Woonsocket) and the visits in which Plaintiff saw Dr. Lim's physician's assistant(s) in addition to or instead of Dr. Lim.

[6]Prevacid is a gastric acid pump inhibitor. It is indicated for short term treatment for healing and symptom relief of active duodenal ulcers. www.rxlist.com. Naproxen is a non-steroidal anti-inflammatory. It is indicated for the relief of the signs and symptoms of osteoarthritis. www.rxlist.com. Vicodin (hydrocodone) is an opioid analgesic. It is indicated for the relief of moderate to moderately severe pain. www.rxlist.com.

Plaintiff presented at the Woonsocket clinic on November 17, 2005 complaining of a rash. The physician's assistant noted Plaintiff had been working at a nursing home and was worried the rash was contagious. AR 202. Plaintiff also complained of continuing back pain. The PA noted Plaintiff was scheduled for an MRI on December 1. The PA noted improved range of motion in Plaintiff's back compared to one month ago. *Id.* Plaintiff complained of leg cramps caused by the Flexeril, so the PA prescribed Robaxin[7] instead. The PA explained to Plaintiff it could be her back injury that was causing the leg cramps. *Id.*

Plaintiff saw the physician's assistant again on December 15, 2005. AR 202. She complained of high blood pressure and headaches in addition to the pain from her truck accident. Plaintiff requested a combination prescription so she would not be required to take so many pills. The PA assessed hypertension and back pain. The PA prescribed Soma[8] with Codeine. On December 20, the PA received a call from Plaintiff requesting a refill of Ultram. He received a note from her insurance company indicating she had been getting refills from multiple pharmacies and physicians, so he refused to refill the prescription. AR 201.

The medical record contains a note from Dr. Lim dated January 13, 2006. Dr. Lim spoke with Plaintiff about her prescriptions and her scheduled appointment with Dr. Elkin. AR 201. Dr. Lim indicated he would refill her Ultram prescription for thirty days and await the results of her appointment with Dr. Elkin. *Id.*

Plaintiff reported to the Clinic on January 19, 2006 complaining of recent chest pain. AR 201. She had recently been seen in the emergency room. She claimed to have continuing tightness in her chest. She reported a history of high blood pressure for which she took medication. She

---

[7]Robaxin is a central nervous system depressant which is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. www.rxlists.com.

[8]Soma is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions in adults. www.rxlist.com.

8

reported a current history of smoking "like a chimney" and a past history of illegal drug use. The physician assessed hypertension and atypical chest pain. AR 200. He prescribed Nitro pills as needed.

On January 23, 2006, Plaintiff apparently called regarding a refill of Ultram. AR 200. She reported she was taking an extra dose at bedtime. The handwritten note is difficult to read, but it appears no extra refills were ordered. *Id.*

Plaintiff saw the PA on February 2, 2006 complaining of a week long history of a sprained ankle. AR 200. She was able to walk without a limp. She also continued to complain of low back pain. She explained she was lifting a 200 pound gate the previous day and felt low back pain that did not radiate to her leg. Although she demonstrated increased tenderness to palpation of the left lumbosacral region, her straight leg raises were negative. The physician's assistant prescribed Soma with Codeine, thirty pills with no refills. AR 200.

Plaintiff saw a physician's assistant in Dr. Lim's office on February 6, 2006 complaining of a sprained right ankle. AR 187. She returned to Dr. Lim on February 15 with continued right ankle pain. *Id.* Her right ankle remained swollen and tender. Dr. Lim called the other pharmacies in town to make sure Plaintiff was not getting prescriptions from other physicians. *Id.* He prescribed Ultram for the ankle pain and instructed her to take Ibuprofen in addition and reassured her that ankle sprains are sometimes slow to heal.

Plaintiff saw Dr. Lim on February 24, 2006. She reported a one and one half week history of left hip pain. AR 199. She did not relate the hip pain to any particular event. The pain was aggravated by walking. *Id.* She denied abusing drugs, and was currently taking Ultram for her right ankle sprain. Dr. Lim ordered an X-ray of Plaintiff's pelvis on February 24, 2006. The scan revealed hips which were symmetrical and normally developed. AR 192. No degenerative changes were apparent. No bony lesions nor noted and the soft tissue shadows were unremarkable. The radiologist noted a "normal pelvis." *Id.* Dr. Lim noted "the acetabulum was not smooth looking

9

bilaterally." AR 199. Dr. Lim noted that none of Plaintiff's symptoms pointed to anything specific. *Id.*

Plaintiff returned to Dr. Lim on February 28, 2006. AR 198. She reported none of the medications were helping her left hip pain. She reported she was unable to sleep. She reported pain whenever her left leg was flexed. *Id.* Dr. Lim observed she walked with an antalgic gait. The pelvis and lower extremity exam reveal no gross abnormality, but positive pain in the left inquinal and left hip region with flexion of the lower left extremity as well as with inferior and exterior rotation; more with interior rotation. AR 198. Dr. Lim ordered a shot of Demerol on February 28, 2006. AR 187.

On March 6, 2006, Dr. Lim ordered a CT scan of Plaintiff's abdomen because she complained of abdominal pain. AR 191. The radiologist noted no pelvic or left groin pathology, but indicated "probably very benign variances" including a slight prominence of the left adrenal gland and column of bertin involving the left kidney. *Id.* His main area of concern was the common bile duct, the sphincter of odi and adjacent lymph node. He suggested "direct inspection" of the sphincter of odi with retrograde cholangiography. *Id.* The CT revealed a normal lung base, liver, spleen and pancreas. AR 190.

On March 10, 2006, Dr. Lim ordered a bone scan, again to investigate Plaintiff's left groin pain. AR 189. The radiologist did not see any evidence of significant bony or articular abnormality in the skeleton, especially the groin or hips. *Id.* Dr. Lim continued to consult with Plaintiff and refill Plaintiff's medications throughout March and April, 2006. AR 186.

On March 17, 2006 Dr. Lim called Plaintiff to explain the results of her bone scan, which were completely normal. AR 197. Dr. Lim noted that regular narcotics such as Vicodin, Morphine and Darvocet all caused Plaintiff adverse reactions such as itching. She tolerated Soma with Codeine and Tramadol. He refilled the Soma and referred her to Dr. Ungacta. *Id.*

10

Plaintiff returned to Dr. Lim on April 21, 2006. AR 197. Her son accompanied her to the appointment. He reported Plaintiff got up a lot during the night. Plaintiff reported she could not lie down on her left side. Her physical exam revealed no gross deformity but positive direct tenderness on the right para lumbar area. The left groin was also positive with direct tenderness; aggravated by log rolling her left lower extremity. AR 197. Dr. Lim assessed left pelvic pain and a urinary tract infection. He prescribed an antibiotic. Dr. Ungacta's office agreed to perform another Cortisone injection in approximately eight weeks. AR 197.

Plaintiff saw Dr. Lim on April 26, 2006. AR 197. She was worried about the effect of Prednisone on her blood pressure. Dr. Lim discontinued the Prednisone and refilled her Ultram and Soma. Dr. Lim noted Plaintiff's current dosages of eight Ultram tablets and four Soma tablets per day. He also confirmed Dr. Ungacta would repeat the Cortisone injection in her left hip joint. *Id.*

On May 19, 2006, Plaintiff saw Dr. Lim and complained of increased left hip pain which now extended to the left foot. AR 196. She indicated Dr. Ungacta refused to give her another Cortisone injection. Dr. Lim's physical exam revealed Plaintiff grimaced during the log roll test of the left leg. *Id.* Her left leg strength and reflexes, however, were essentially normal. Dr. Lim contacted Dr. Ungacta's office to clarify the reason for his refusal to perform another injection. Dr. Lim explained to Plaintiff her best option would be pain control and the use of crutches or a cane. AR 196. He recommended conservative treatment. He discontinued the Soma and substituted Tylenol #4 and refilled her Ultram. He prescribed Amitriptyline[9] for sleep. He instructed her to use a cane. AR 196. Dr. Lim noted that if the pain control was unsatisfactory, Plaintiff "will have to undergo a left hip replacement." AR 196.

Plaintiff returned to Dr. Lim's office on June 9, 2006 with both her son and her daughter. AR 195. She had discontinued taking Tylenol #4 because it constipated her. She admitted taking more than the prescribed amount of Soma because of her pain. Dr. Lim's physical exam continued to reveal increased pain with log rolling on the left leg. *Id.* Dr. Lim referred Plaintiff to Dr.

_____

[9] Amitriptyline is indicated for the relief of symptoms of depression. www.rxlist.com.

11

McWhirter. He prescribed Morphine in addition to her current medications. Dr. Lim also confirmed with Dr. Ungacta that the left hip was the pain generator for Plaintiff's left groin pain. Plaintiff called Dr. Lim's office on June 16 to report her appointment with Dr. McWhirter had been postponed. AR 195. She also reported she had adverse side effects (headaches) from the Morphine, so Dr. Lim approved discontinuing the Morphine. *Id.* Plaintiff called again on June 30 for refills, which were provided. AR 224. She continued to receive prescription refills through September, 2006. AR 223.

On September 9, 2006, Dr. Lim wrote a letter "To Whom it May Concern" indicating Plaintiff would be unable to work until her hip problem was resolved by an orthopedic surgeon. AR 225.

On October 4, 2006, Plaintiff called Dr. Lim's office requesting an early refill of her Soma and Tramadol prescriptions. She explained she had not been taking the Morphine because it gave her a headache, but had been taking extra Soma instead. AR 270. Dr. Lim refused to refill her prescriptions early, stating "under no circumstances am I giving her more of her medications earlier than scheduled." *Id.*

On November 1, 2006, Plaintiff reported to Dr. Lim that she had seen Dr. Baumgarten[10] in Sioux Falls. AR 269. She indicated Dr. Baumgarten needed another MRI "so ligaments could be seen" and to try another Cortisone shot. Plaintiff indicated the MRI was scheduled for November 13, 2006. On November 22, Plaintiff called Dr. Lim's office stating her surgery had been postponed until the middle of December. AR 269. She reported "excruciating" hip pain. *Id.* Dr. Lim prescribed Lorazepam.[11] On November 27, Dr. Lim received the results of an arthrogram Plaintiff had undertaken a few days earlier at the hospital. AR 269. It showed a focal area of bony sclerosis which likely presents a bone island. AR 275. An MRI of the left hip with contrast showed no

[10]Dr. Baumgarten's medical records are not part of the administrative record.

[11]Lorazepam is indicated for the management of anxiety disorders or short-term relief of anxiety or anxiety associated with depressive symptoms. www.rxlist.com.

evidence of focal abnormality with no evidence of a labral tear. AR 269, 274.

Dr. Lim's office notes dated February 21, 2007 contain an entry regarding his conversation with Dr. Becker (Plaintiff's gynecologist) the previous day. Dr. Lim spoke with Dr. Becker about Plaintiff's attempt to obtain from him (Becker) the same prescriptions she was getting from Dr. Lim, except from a different pharmacy. AR 268. Drs. Becker and Lim agreed that Dr. Becker would not prescribe pain medication after the upcoming hysterectomy which Dr. Becker would be performing. Dr. Lim discussed the issue with Plaintiff. Plaintiff informed Dr. Lim she would no longer receive services from the pain clinic in Sioux Falls because she was unable to pay her bills; therefore they would no longer treat her. *Id.*[12] The record also contains a "To Whom it May Concern" note dated February 21, 2007, indicating Plaintiff should be on "total disability" until she gets evaluated by the Mayo Clinic in Rochester, Minnesota. AR 278.

Plaintiff called Dr. Lim's office on March 20, 2007 after starting the stop-smoking drug Chantix. AR 268. She had a headache and was vomiting. Dr. Lim recommended Plaintiff eat small meals and try to tolerate the next few days. He recommended stopping the drug if there was no improvement. *Id.*

Plaintiff called Dr. Lim on March 26, 2007 after having been seen in the emergency room the prior evening for elbow pain. AR 268. Dr. Lim noted Plaintiff's emergency room diagnosis of thrombose phlebitis of the right elbow but he believed it sounded more like olecranon bursitis. He prescribed aspirin and Augmentin.[13] Plaintiff saw Dr. Lim on March 28. AR 268. She never received Dr. Lim's message to get the antibiotic. The swelling in her elbow had, however, decreased significantly. She was able to bend her elbow with good range of motion. Dr. Lim canceled the antibiotic prescription and recommended Plaintiff continue with aspirin and ice.

---

[12] The only medical providers from Sioux Falls mentioned in this record are from the Orthopedic Institute–Drs. Looby and Baumgarten.

[13] Augmentin is an oral antibacterial indicated for the treatment of infection. www.rxlist.com.

13

On April 4, 2007, Plaintiff continued to complain about pain in her right elbow. AR 267. The right arm revealed tenderness in the forearm but a good radial pulse and excellent muscle strength. Dr. Lim diagnosed thrombophlebitis.

Plaintiff called Dr. Lim's office on April 11, 2007 again complaining of left hip pain. AR 267. Dr. Lim tried to obtain a referral to an orthopedic physician but was unable to do so because Plaintiff was unable to pay for the services. *Id.* Dr. Lim scheduled an MRI of Plaintiff's low back. *Id.* The MRI of the lumbar spine was performed at Avera Queen of Peace Hospital in Mitchell, South Dakota on April 17, 2007. AR 272. It showed left posterior lateral disc bulging at L3-4 and modest disc bulging at L4-5. The radiologist diagnosed degenerative disc disease but doubted any significant encroachment. AR 273.

Plaintiff called Dr. Lim's office on May 7, 2007 regarding her right elbow pain. AR 266. She wondered if she should be seen in the emergency room or wait to have Dr. Lim see her in the office. Dr. Lim's nurse advised her to be examined in the emergency room and follow up with Dr. Lim. *Id.*

Plaintiff returned to Dr. Lim on May 9, 2007. AR 266. He noted Plaintiff had not worked over the weekend because of the storms, she had been doing a lot of mopping and cleaning around the house. *Id.* Plaintiff went to the emergency room because of increased pain and swelling in her arm. An ultrasound of her arm showed thrombosis. She was given a steroid shot and instructed to follow up with Dr. Lim. Examination of her right arm revealed swelling and redness of the middle of the right forearm. Dr. Lim ordered a blood panel which was normal. *Id.* He instructed her to take Aleve for the pain and call in two weeks to report her status. Plaintiff called Dr. Lim on May 15 to report her arm was worse. AR 265. Dr. Lim advised Plaintiff she could take up to eight Tylenol per day, and that he would refer her to a vascular surgeon.

Plaintiff's attorney asked Dr. Lim to complete a Physical Residual Functional Capacity Assessment in December, 2007. AR 280. Dr. Lim diagnosed left hip pain. AR 282. He indicated

14

Plaintiff's symptoms include left groin pain with prolonged sitting and standing and that her prognosis is uncertain. *Id.* He also indicated that she experiences increased pain with external rotation of the left lower leg, although there were no other obvious clinical findings. She treats with chronic narcotic or narcotic-like medications whose side effects include drowsiness, dizziness, nausea, additional pain, lethargy and constipation. He does not believe Plaintiff is a malingerer. AR 284. Emotional problems could contribute to the severity of her problems. Her impairments are reasonably consistent with the symptoms and functional limitations described in his evaluation. He estimated her pain and symptoms would occasionally interfere with work. He also estimated she would be capable of low stress jobs. AR 284. He estimated she could walk less than one block. Dr. Lim explained he could not complete the section regarding Plaintiff's physical abilities but suggested an independent medical examiner. AR 283. He stated "Patient's diagnosis is unclear. Was scheduled to be seen in Mayo Clinic in Rochester in November but had car trouble." *Id.* Dr. Lim declined to opine how long Plaintiff can sit, stand or walk during an eight hour work day. AR 284-85. He did indicate that she needs a job that allows her to shift positions and take un-scheduled breaks. AR 285. He also opined she can frequently lift 20 pounds and never lift 50 pounds. AR 285. She can rarely stoop, crouch and climb, never climb ladders, and occasionally twist. AR 286. She has no limitations regarding the use of her hands. *Id.* Her limitations are likely to result in good days and bad days. *Id.*

## 5. Orthopedic Institute–Dr. Looby–July 24, 2006

Plaintiff saw Dr. Peter Looby on July 24, 2006. AR 216. He noted she had been having left hip pain since her motor vehicle accident in September, 2005. Dr. Looby noted good passive range of motion in the left hip but some limitation on abduction with pain and external rotation in the flexed position. AR 216. He noted the pain originated in the groin area; not from the greater trochanteric area. There was no specific tenderness and normal neurovascular exam. Dr. Looby suspected a labral tear. He ordered an MRI and follow up with Dr. Baumgarten. *Id.* [14]

---

[14]According to the medical record contained at AR 216 from Orthopedic Institute, Dr. Baumgarten is one of Dr. Looby's partners. It is unknown why Dr. Baumgarten's records have not been provided for the Court's consideration.

### 6. Huron Regional Medical Center–Dr. Becker–2/02/07 through 3/03/27

Dr. Becker X-rayed Plaintiff's chest and conducted pulmonary function tests on February 2, 2007. AR 230-32. He diagnosed emphysema and mild chronic obstructive pulmonary disease. *Id.* Plaintiff was admitted to the Huron Regional Medical Center on February 27, 2007 for a hysterectomy. She was discharged after a four day hospitalization with no complications. AR 237.

### 7. Non-treating, Non-Examining State Agency Physician–Dr. Whittle–Dr. Kevin Whittle, MD. 8/11/06

State Agency Physician Kevin Whittle, MD completed a Physical Residual Functional Capacity Assessment on August 11, 2006. Dr. Whittle did not treat or examine the Plaintiff. Dr. Whittle assigned the following physical restrictions: occasional lifting 50 pounds, frequently lifting 25 pounds, stand/walk/sit 6 hours out of an 8 hour day, unlimited push/pull. AR 135. He assigned no postural limitations (climbing, balancing, stooping, kneeling, crouching, crawling). AR 136. The only environmental limitation imposed was to avoid even moderate exposure to fumes, odors, gases and poor ventilation. AR 138. Dr. Whittle acknowledged there was no treating or examining source statement regarding Plaintiff's physical capacities in the file for his review. AR 140. He indicated Plaintiff's "symptoms out-of-proportion to the objective findings and some of her allegations are not supported by the medical evidence–?credibility." AR 139. In support of his conclusions, Dr. Whittle stated:

> 43 year old female with hx of neck/back strain related to an MVA. She has had chronic left hip/groin pain for which an etiology has not been found. Physical examination shows some pain with ROM in the hip but no neuromuscular deficits. X-rays of the cervical and LS spine were normal. Left hip x-rays showed some irregularity of the femoral heads but bone scan was normal. She alleges COPD for which she lists nebulizer for medication but this is not documented in the medical records. She also alleges liver cancer which is also not supported by the medical evidence. CT of the abdomen and pelvis showed some bilary ductal dilation and prominence in the area of the sphincter of Odi but no definite masses.

On October 4, 2006, Dr. Larry VanderWoude, another non-examining, non-treating State Agency physician affirmed Dr. Whittle's findings. AR 227.

### E.    Hearing Testimony

Plaintiff's administrative hearing was held on January 10, 2008 in Huron, South Dakota. Plaintiff and William Tucker, a vocational expert, testified. Plaintiff was represented by counsel and accompanied by her daughter.

Plaintiff was forty-four years old at the time of the hearing. She completed the eighth grade and has never obtained her GED. AR 295, 335. She has never attended vocational school. She has not been employed since September 7, 2005. AR 296. The only jobs she has held in the last fifteen years are truck driver and nurse's aide. *Id.* She does not believe she can drive a truck any longer because of back and hip pain. She cannot sit, walk or lie down for extended periods of time. *Id.* She cannot lift. AR 297. The nurse's aide job requires significant walking and bending and she is not capable of that. *Id.* She lays in a recliner most of the day. She cannot lift a laundry basket. If she does, she begins to shake and hurt so badly that she has to let go of the basket. *Id.*

Plaintiff identified her physical problems as follows: lower back problems, left hip pain, "real bad" asthma, lost all the strength in her lower body, cannot walk very far, and cannot sleep because of her pain. AR 298. She also has problems with her liver and kidneys. *Id.* Her low back condition affects her ability to lift and carry. *Id.* Her doctor told her not to lift over five pounds. AR 299. She does not think she should lift anything heavier than a gallon of milk. If she tries to carry a basket of laundry, she will "get to hurting real bad." *Id.* She uses a cane to walk. Dr. Lim prescribed it. AR 299. She can't carry anything because she will drop it–her daughter carries her purse for her. AR 300.

In an eight hour day, Plaintiff estimated she spends seven and one-half hours in her recliner. AR 301. She only gets up to go to the bathroom. *Id.* If she is more active than that, she is up all night crying because of the pain. If she stands for too long her legs shake and she needs to sit down. AR 302. If she lays on her side she gets sharp pain. AR 301. She sleeps in her recliner. She takes medication every six hours. *Id.* Plaintiff testified she needed to stop twice while walking from her vehicle into the building for the administrative hearing. AR 303.

17

Plaintiff explained that Dr. Lim recommended she see a specialist at the Mayo Clinic in Rochester. AR 304. She has not gone because she cannot ride that far. *Id.* She had an appointment a couple of months before the administrative hearing but she had to cancel it because her ex husband's brother (her daughter's uncle) died and they went to the funeral. *Id.*[15] It is Plaintiff's understanding that the cause of her pain is something at the base of her spine that cannot be surgically corrected. AR 330.

Plaintiff explained she needed to move around during the hearing because it was starting to hurt for her to sit in one position. AR 304. If she drops something on the floor, she uses her cane to retrieve it. AR 305. If she twists, it "takes her breath away." AR 306. She estimated she sleeps only three or four hours per night because of pain. AR 305. She has tried hot baths, heating pads, and everything. She tried morphine but she does not like the way it makes her feel and does not want to get "strung out" on that. *Id.*, AR 318. Plaintiff explained there was a peanut-sized cancerous tumor on the gland above her kidney, but it is so small right now they cannot tell what it is. AR 306. She indicated her doctors recommend a future MRI. *Id.* At the time of the administrative hearing, she had an appointment scheduled for further testing within the following month. AR 307. [16] Plaintiff estimated that out of an eight hour day, she could only be out of her recliner for about a half an hour. AR 307. Her daughter prepares meals for her. AR 308. Plaintiff's medication makes her very drowsy, but if she does not take it the pain is so unbearable that she cries. *Id.* She rated her pain on the day of the hearing as 7/10. First thing in the morning her pain is 8-9/10. After she takes her medication, the pain is 6/10. AR 309. It never gets any better than 6/10. AR 310. It feels like somebody is stabbing her with a knife and twisting it. AR 314. She previously had surgery on her right knee in 1996 and it still swells up. AR 315. She used her grandmother's cane to walk before she got her own. AR 316.

---

[15]Dr. Lim's note indicated Plaintiff cancelled the appointment because of "car trouble." AR 283.

[16]The records received after the hearing (AR 278-287) did not include any regarding a cancerous tumor on or near Plaintiff's kidney.

Plaintiff used to ride motorcycles but she had to quit that activity because of her pain. AR 310. She also moved from a split level to a one floor home because she could not handle the stairs. *Id.* She has had asthma and breathing problems since 2004. AR 311. She does four breathing treatments with a nebulizer machine per day. Her breathing treatments last forty-five minutes each. *Id.* She does her breathing treatments at 6:00 a.m, noon, 4:00 p.m. and 8:00 p.m. AR 311. If she misses a treatment she starts gasping for breath. AR 312. She has been a three pack-a-day smoker for twenty-five years but is trying to quit. She takes the medication Chantix and is down to one-half pack- a- day. *Id.* Anything physical is difficult for her because of her breathing problems. AR 313.

Plaintiff claimed the overdose of muscle relaxants in October, 2005 was accidental. AR 318. She claimed she had forgotten she'd already taken her medication and took it again. AR 319. As soon as she realized her mistake, she called her ex-husband and he took her to the hospital. *Id.*. Plaintiff adamantly denied a suicide attempt. *Id.*

Plaintiff explained her teenage daughter does all the cooking, cleaning and shopping because Plaintiff is incapable of those activities. AR 320. Plaintiff does not drive; her daughter drives her wherever she needs to go. AR 332. Plaintiff claimed if she ran the vacuum cleaner she would have "throbbing pain" for the next eight hours. AR 321. Plaintiff belongs to no groups or clubs and does nothing outside the house. She leaves the house only for doctor's appointments and quick errands. *Id.*

Dr. William Tucker, vocational expert (VE), was the only other witness who testified at the hearing. AR 333. He testified that Plaintiff does not have any transferrable skills. AR 334. The ALJ asked the VE three hypothetical questions. All three hypotheticals asked the VE to assume Plaintiff's age and education. The first hypothetical asked the VE to assume Plaintiff had the impairments exactly as described by her. The VE opined Plaintiff's past relevant work, as well as sedentary work, would be ruled out. AR 335.

The ALJ's second hypothetical asked the VE to assume the limitations imposed by the state

agency physician. AR 336. Specifically the ALJ asked the VE to assume Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and could stand, walk, or sit for 6 hours out of an 8 hour day. Her only other limitations were to avoid moderate exposures to respiratory irritants. In other words, she was capable of medium duty work in a controlled air environment. The VE opined her capabilities were consistent with her past work as a nurse's aide as described by the DOT but not as described by Plaintiff. AR 336. Her current capabilities would not be consistent with her past work as a truck driver. The VE also opined her current capabilities under the second hypothetical would be consistent with a wide range of medium jobs such as: hand packager and dining room attendant. AR 336-37. If, however, Plaintiff's testimony is deemed credible, she would not be capable of any of those jobs, because the necessity of spending seven and one-half hours per day in a recliner is "not compatible with employment." AR 337.

The ALJ presented a third hypothetical to the VE which incorporated Dr. Lim's physical residual functional capacity assessment. AR 337. The VE opined those restrictions would be inconsistent with Plaintiff's past work (AR 339) and with any other work the VE had identified. *Id.* The VE explained that the unscheduled breaks and the ability to get up and walk around, as identified as necessary by Dr. Lim, "are not going to be tolerated in any type of full-time competitive employment." *Id.* The VE also explained that Dr. Lim's expectation that Plaintiff will have good days and bad days "suggests some level of absenteeism. I think that combination of factors would rule out any kind of full-time, competitive employment." *Id.*

## DISCUSSION

### A.     Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more

than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Id. If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

## B.   The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d

1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler,* 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C. Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8ᵗʰ Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8ᵗʰ Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5ᵗʰ Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7ᵗʰ Cir. 1987).

## D. The ALJ's Decision

The ALJ issued a twelve page, single-spaced decision on February 20, 2008. The ALJ's decision discussed steps one through five of the above five-step procedure. At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since her alleged onset date (September 7, 2005). AR 19.

At Step Two, the ALJ determined Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine from L2 to L5 demonstrated on the April 17, 2007 MRI and mild chronic obstructive pulmonary disease demonstrated on pulmonary function tests of February 2, 2007. The ALJ specifically rejected Plaintiff's claimed hip impairment as a medically determinable physical impairment, citing the (1) lack of objective medical evidence; (2) Plaintiff's inconsistent reports to her treating physician regarding whether she would or would not be undergoing surgery in Sioux Falls for her hip condition; and (3) Plaintiff's credibility. AR 21-23.

At Step Three, the ALJ determined Plaintiff does not have an impairment of combination of impairments that meet or equal a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). He reiterated that Plaintiff's allegations of hip pain alone are not sufficient to establish the presence of an impairment and that her need for a cane to ambulate is not supported by the medical evidence or credible medical opinion in the record. AR 24. "The claimant's assertions in this regard [are] found highly exaggerated and not credible." *Id.*

23

At Step Four, the ALJ found Plaintiff has the residual functional capacity to perform medium work as defined in C.F.R. 404.1567(c) and 416.967(c) except that she should avoid even moderate exposure to unclean air environments. AR 24. As such the ALJ "agrees generally with the conclusions of the state agency physicians regarding the claimant's residual functional capacity. Testimony of the claimant as to the presence and severity of various impairments alleged, including pain, with resultant functional limitations, is found highly exaggerated, not credible other than as to a mild breathing impairment, and not substantially supported by medical evidence and credible medical opinion in the record . . ." AR 24. Nevertheless, the ALJ concluded that based on her breathing impairment, Plaintiff is not capable of her past relevant work as a truck driver or a nurse's aide. AR 27.

At Step Five, the ALJ determined Plaintiff is capable of medium duty work with some additional limitations. He determined she remained capable of such occupations as: hand packager and dining room attendant. AR 28. As such the ALJ determined Plaintiff is not "disabled" as that term is defined by the Social Security Act. *Id.*

### E. The Parties' Positions

Plaintiff asserts the ALJ erred by finding her not disabled within the meaning of the Social Security Act. She asserts the ALJ erred in two ways: (1) by failing to properly consider evidence of hip pain in evaluating her functional capacity; and (2) by failing to properly consider Dr. Lim's opinion.[17] The Commissioner asserts his decision is supported by substantial evidence on the record, is free of legal error, and should be affirmed.

### F. Analysis

Plaintiff asserts the ALJ made two mistakes: (1) by failing to properly consider evidence of hip pain in evaluating her functional capacity; and (2) by failing to properly consider Dr. Lim's opinion. These assertions will be examined in reverse order.

---

[17]Both arguments contain several sub-arguments.

### 1. Whether the ALJ failed to properly consider Dr. Lim's opinion

Dr. Lim's records are found at AR 185-193, 225, 265-277 ( (Horizon Health Care Clinic, Jerauld County) and AR 194-204, 221-224, 278 (Horizon Health Care, Inc. Whiting Memorial Clinic) and 279-287 (functional capacity analysis). Plaintiff treated with Dr. Lim for slightly over two years (October, 2005 through December, 2007). Dr. Lim referred Plaintiff to various specialists and requested several diagnostic procedures in an effort to find the cause of the hip pain about which she complained. He conceded, however, that there were "no obvious clinical findings" for his diagnosis of left hip pain. AR 282. He also indicated her prognosis was "unknown" because her diagnosis was "uncertain." *Id.* He indicated, however, that her impairments were reasonably consistent with her symptoms and functional limitations. AR 284. He declined to assess her functional limitations and asked that an independent medical examiner be assigned to that task. AR 283. Nevertheless, Dr. Lim opined Plaintiff's hip pain would necessitate that any job she held allow her to shift positions at will and take unscheduled breaks throughout the day. AR 285.

The ALJ assigned Dr. Lim's opinion "no weight." AR 22. The ALJ explained that he rejected Dr. Lim's opinion because Dr. himself declined to assign physical restrictions but instead suggested an independent medical examiner, and that Dr. Lim noted Plaintiff's referrals to orthopedic specialists had resulted in normal CT and bone scans. *Id.*

"[A] treating physician's opinion is normally accorded a higher degree of deference than that of a consulting physician, but such deference is not always justified. When the treating physician's opinion consists of nothing more than conclusory statements, the opinion is not entitled to greater weight than any other physician's opinion." *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991). Also, "a physician's conclusory statement of disability without supporting evidence does not overcome substantial medical evidence supporting the secretary's decision." *Loving v. Dept. of Health and Human Services Secretary*, 16 F.3d 967, 971 (8th Cir. 1997). To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques and not be inconsistent with the other substantial evidence in the record. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). The ALJ is "not required to believe the

opinion [of the] treating physician, when, on balance, the medical evidence convinced him otherwise." *Rogers v. Chater*, 118 F.3d 600, 602 (8ᵗʰ Cir. 1997). Also, "[t]he agency 'generally gives more weight to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist." *Reed v. Massanari*, 270 F.3d 838, 845 (8ᵗʰ Cir. 2001); 20 C.F.R. § 404.1527(d)(5). Finally,

> [A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled.

> We must keep in mind the biases that a treating physician may bring to the disability evaluation. The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise.

*Dixon v. Massanari*, 270 F.3d 1171, 1177 (7ᵗʰ Cir. 2001) (internal punctuation and citations omitted). Also, 20 C.F.R. § 404.1527(d) provides the factors to consider for assigning weight to medical opinions. That regulation provides:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>    (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>    (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's

opinion.

(I) Length of treatment relationship and frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s)the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****. When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

This is one of the rare instances in which the ALJ's decision to give the treating physician's opinion "no weight" is supported by substantial evidence. The treating physician indicated in his own report that functional capacity should be deferred to an independent medical examiner (AR 283). Dr. Lim also conceded that there are "no obvious clinical findings" to support his diagnosis and that his

diagnosis is uncertain. AR 282. Additionally, Dr. Lim's limitations are based solely on his diagnosis of hip pain (AR 282). For the reasons explained below, the ALJ's determination that hip pain is not a medically determinable impairment is supported by substantial evidence. Because left hip pain is not a medically determinable impairment, the ALJ's decision to disregard Dr. Lim's opinion is therefore likewise supported by substantial evidence.

### 2. Whether the ALJ Should Have Included Plaintiff's Hip Pain In His Functional Capacity Analysis

At step two, the ALJ found Plaintiff had two "severe" impairments, but that her hip pain was not the result of a medically determinable physical impairment. AR 21. Because he found the hip pain was not the result of a medically determinable physical impairment, the ALJ did not consider it in any of the following steps, including the determination of Plaintiff's residual functional capacity at Step Four. Plaintiff asserts the ALJ erred by failing to consider her hip pain in the functional capacity analysis in two ways: he failed to consider the hip pain as an impairment and based on that failing, he failed to consider limitations due to hip pain in the RFC analysis.

### a. Whether the ALJ Erred By Failing to Consider Plaintiff's Hip Pain As a Medically Determinable Impairment

At Step Two, the ALJ determined Plaintiff had two severe impairments: degenerative disc disease of the lumbar spine and mild chronic obstructive pulmonary disease. AR 19-20. The ALJ acknowledged but rejected Plaintiff's contention that her ongoing hip pain met the definition of a medically determinable impairment pursuant to 42 U.S.C. § 423(d)(3) and 20 C.F.R. § 1529(b) and SSR 96-4p. For the following reasons, the ALJ's finding is supported by substantial evidence.

The definition of "disability" is found at **42 U.S.C. § 423(C)(3)**. That section states in relevant part:

> (3)     For purposes of this subsection, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

The ALJ cited **20 C.F.R. § 1529**. That regulation explains the relationship between

symptoms, laboratory findings, and medical impairment. It states in relevant part (emphasis added):

**(a)** **General.** In determining whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence we mean medical signs and laboratory findings as defined in 404.1528(b) and (c). . . . . However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings) would lead to a conclusion that you are disabled. . . . .

**(b)** **Need for medically determinable impairment that could reasonably be expected to produce your symptoms, such as pain.** Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present. Medical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques, must show the existence of medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . . .

**(c)** **Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work–**

(1) General. When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms . . .

29

Finally, the ALJ cited **SSR 96-4p.**[18] That Social Security Ruling provides further interpretation of 42 U.S.C. 423(d) and 20 C.F.R. § 1529. It explains in relevant part that:

> [A]though the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medially determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e. medical signs and laboratory findings.
>
> No symptom or combination of symptoms by itself can constitute a medically determinable impairment. In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled . . . .
>
> Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of symptoms must be considered with the objective medical abnormalities, and all the other evidence in the case record, and evaluating the functionality and limiting effects of the impairments(s) . . . .

The difference between a "sign" and a "symptom" is explained in *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005). "Symptoms are an individual's own perception or description of the impact of his or her physical impairment(s) . . .when any of these manifestations is an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a 'sign' rather than a 'symptom.'" *Id.* at 1005 (citations omitted). Cited examples of "symptoms" in *Ukolov* are gait ataxia, balance problems, dizziness, ambulation

---

[18]SSR is an acronym for Social Security Ruling. A court must give deference to an agency's interpretation of its own regulation, but is not bound by it. "Social Security Rulings are intended to bind only the Social Security Administration . . .they have neither the force nor effect of law or Congressionally promulgated regulations." *Newton v. Chater*, 92 F.3d 688, 693 (8th Cir. 1996) (citations omitted).

problems, and an increased tendency to fall "because they are based solely on [claimant's] own perception or description of his problems." *Id.* at 1006.[19] Cited examples of "signs" are blood pressure screening, electrocardiogram, electroencephalogram, and diagnostic MRI and CAT scans. *Id.* "Pain is a symptom, not an impairment." *Davis v. Astrue*, 2010 WL 2195759 (W.D. Washington).

The record contains documentation of Plaintiff's consistent complaints of left hip pain beginning in February, 2006. AR 199. The diagnostic clinical and laboratory testing which followed until the date of the administrative hearing, however, was inconclusive as to the cause of Plaintiff's left hip pain. An x-ray in February 2006 showed Plaintiff's hips are "symmetrical and normally developed. There is no joint space narrowing or bony spurring to suggest degenerative change. No focal bony lesions are seen. The visualized soft tissue shadows are unremarkable." AR 148. In March 2006 a CT scan revealed "no pelvic or left groin pathology." AR 191. The interpreting physician noted "really nothing wrong with patient's left groin area and left hip joint." AR 187. In March 2006 a bone scan was normal. AR 189. In November 2006 a left hip arthrogram revealed "no evidence for focal abnormality within the left hip joint; no evidence for labral tears." AR 274.

Plaintiff's treating physician (Dr. Lim) supports her disability claim based on her assertion of left hip pain. His opinions are based upon his exam which included a "log roll test"[20] (AR 195-97)

---

[19]Also cited is the "Rhomberg Test" in which the subject stands with feet approximated and with eyes open and then closed. If closing the eyes increases the subject's unsteadiness, the sign is positive. The Court classified this as a "symptom" because it is subject to manipulation. *Ukolov*, 420 F.3d at 1006.

[20]An explanation of the "log roll test" is found in the *Journal of Orthopaedic & Sports Therapy*, September 2008, Vol. 38, No. 9, p. 558. "The log roll test is used to assess for acetabular labral pathology and general hip joint laxity, which may predispose an individual to injury. This test has been shown to demonstrate moderate interrater reliability (ICC = 0.63) and is performed with the patient supine with both lower extremities in neutral hip flexion/extension and adduction/abduction. The examiner maximally internally and externally rotates the femur, comparing range of motion bilaterally. The presence of clicking may indicate a labral tear. In this particular patient, the log roll test was found to be positive, reproducing pain and eliciting a clicking when moving into a position of femoral internal rotation. This finding was compelling

and range of motion tests. AR 216. The "log roll tests" revealed that Plaintiff "grimaced" when her left leg was log rolled. AR 195-96. Her strength test was 4+/5 and her reflexed were normal. AR 196. Dr. Looby (the orthopedist) noted Plaintiff had "good passive range of motion but some limitation on abduction with pain and external rotation in the flexed position." AR 216. Dr. Lim conceded there was "no obvious clinical findings" to explain Plaintiff's pain complaints. AR 282.[21] Given this concession, together with the above explanation of the "log roll" test, it is apparent that Plaintiff's left hip pain is not a medically determinable impairment which has been established by medical signs or laboratory findings. The "log roll" test was positive because Plaintiff "grimaced"–Plaintiff's "own perception or description of her problem." *Ukolov*, 420 F.3d at 1005-06. The grimace, therefore, is a "symptom" which under no circumstance may establish a medically determinable impairment in the absence of medically acceptable clinical and laboratory diagnostic techniques. SSR 96-4p. Given the negative diagnostic tests, especially the arthrogram which revealed no labral tear, the ALJ's determination that Plaintiff's alleged hip pain was not a medically determinable impairment is supported by substantial evidence in the record.

### b. Whether the ALJ Erred By Failing to Consider Limitations Due to Plaintiff's Hip Pain in the RFC Analysis

Plaintiff asserts the ALJ erred when he failed to consider her hip pain in formulating her RFC. She asserts that pursuant to 20 C.F.R. § 404.1545(e) and SSR 98-8p, the ALJ was required to consider all impairments, even those that are not "severe" when determining RFC. She asserts that because her hip pain was omitted from the RFC analysis, reversal and remand is required.

The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogated on other grounds in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000). However, "[t]his does not mean that the

_____

in that it revealed the provocative nature of isolated hip internal rotation even when the hip was in neutral flexion/extension and abduction/adduction."

[21]The arthrogram detected no labral tear (the defect for which the "log roll test" is supposed to be diagnostically predictive). AR 274.

hypothetical must include all of the impairments a claimant alleges. It is required to include only those impairments that the ALJ finds actually exist, and not impairments the ALJ rejects–assuming of course, that the ALJ's findings are supported by substantial evidence." *Onstad v. Shalala*, 999 F.2d 1232, 1234-35 (8ᵗʰ Cir. 1993). Additionally, "[i]t is the claimant's burden, not the Social Security Commissioner's burden, to prove the Claimant's RFC." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8ᵗʰ Cir. 2001) (citations omitted). The procedure to determine a claimant's RFC was summarized as follows in *Pearsall*:

> It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations. Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. A lack of work history may indicate a lack of motivation to work rather than a lack of ability. The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.

*Id.* at 1217-1218 (citations omitted).

As explained above, the ALJ's determination Plaintiff did not have a medically determinable hip impairment is supported by substantial evidence. For that reason, Plaintiff's complaints of hip pain were properly excluded from the RFC analysis.

## CONCLUSION

For the reasons explained above, it is respectfully recommended that the Commissioner's denial of benefits be AFFIRMED, and the Plaintiff's Complaint be DISMISSED, with prejudice and on the merits.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

*Nash v. Black,* 781 F.2d 665 (8th Cir. 1986).

Dated this <u>/5</u> day of June, 2010.

BY THE COURT:

John E. Simko
United States Magistrate Judge

JOSEPH HAAS, Clerk

By _Colleen Schulte_ , Deputy